IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MARIA SIMON, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 21-CV-1678 |
| | ) | |
| v. | ) | Judge Robert W. Gettleman |
| | ) | |
| MUNICIPAL CONSOLIDATED DISPATCH, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION & ORDER**

Plaintiff Maria Simon brings her one-count amended complaint against defendant Municipal Consolidated Dispatch ("MCD" or "defendant") pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, for discrimination on the basis of her disability, and for retaliation based on her request for accommodations. On January 20, 2023, defendant moved for summary judgment pursuant to Federal Rule of Civil Procedure 56(a) (Doc. 50). For the reasons discussed below, the court grants defendant's motion (Doc. 50).

**BACKGROUND**

Defendant is a consolidated public safety dispatch center that receives emergency calls and dispatches police, fire, and emergency medical services personnel to respond. Ronald Gross ("Gross) was defendant's executive director, and as executive director Gross was responsible for hiring and disciplining employees. Plaintiff began working for defendant as a dispatcher in September 2017, and she was responsible for answering 911 calls, dispatching first responders, and talking to first responders on the radio. Diana O'Connell ("O'Connell") and Edgar Perez ("Perez") were plaintiff's immediate supervisors, who conducted plaintiff's annual performance evaluations and day-to-day supervision.

1

In her deposition, plaintiff testified that she was familiar with defendant's Employee Manual. Section 2.6 states that "employees should conduct themselves in a professional manner and use good judgment in their job duties." Behavior that "interferes with Agency operations, is detrimental to the Agency, and/or is offensive to co-workers or the public will not be tolerated," and conduct that is against its policies "may result in disciplinary action, up to and including termination of employment." Further, Section 9.3 independently provides that employees may be subject to discipline for violating defendant's rules, regulations, written directives, memorandums, written and/or verbal orders of the Agency; "for any other act or omission which may subvert order and discipline"; or for "any other conduct deemed unbecoming an employee, conduct which may erode the confidence, moral and efficiency of the Agency." Section 9.3 also explains defendant's progressive discipline policy, which involves a continuum of corrective action, with "some incidents, due to the severity or persistence, [requiring] more severe disciplinary action."

Throughout her employment with defendant, plaintiff demonstrated a record of below-expectations performance and disciplinary actions. In January 2018, plaintiff began scheduled mentoring sessions with Gross, during which they reviewed her calls, and Gross offered constructive criticism. Plaintiff eventually made the unilateral decision to end these mentoring sessions because, from her perspective, they turned "hypercritical" after she received a written reprimand in May 2018 for entering an incorrect address for a 911 call and causing a two-minute delay in the emergency response. The reprimand also recounted that plaintiff became argumentative with the caller, prompting Gross to direct plaintiff to submit five calls per shift for review and attend weekly coaching/mentoring sessions. Plaintiff initially submitted her calls to Gross, but later stopped, in addition to ceasing to attend her coaching sessions.

Plaintiff's behavior problems continued into the next month and the next year. In June 2018, plaintiff received two separate one-day suspensions for violating the Employee Manual. On June 4, 2018, plaintiff again entered an incorrect address that resulted in a thirteen-minute delay. On June 12, 2018, plaintiff responded to a caller in a "discourteous, sarcastic, and unprofessional manner," which violated the Employee Manual and a written directive. In February 2019, Gross issued plaintiff a two-day suspension for her conduct in December 2018 (failing to communicate to an officer that a caller wished to remain anonymous), and in January 2019 (responding to a caller in a disrespectful and argumentative manner).

Along with the two-day suspension, plaintiff received a three-day suspension for violating an agency-wide memorandum warning employees that inappropriate conversations (i.e., gossiping) about other employees would be subject to discipline.[1] Moreover, Gross placed plaintiff on a two-year probation, and informed her that any future transgressions would result in disciplinary action up to and including termination. The disciplinary memorandum stated that plaintiff demonstrated "a continual pattern of behavior which is disruptive to fellow co-workers and casts a negative perception on the image of MCD," and that efforts to modify her behavior through counseling, mentoring, and progressive discipline "have yielded negative results."

Plaintiff did not formally respond to her disciplinary consequences up to this point, including her probation, and in May 2019, plaintiff received a "Below Expectations/Needs Improvement" score on her 2017–2018 performance appraisal with Perez (one of her supervisors). Perez noted plaintiff's performance problems, including seven unscheduled absences, a tendency to escalate rather than de-escalate callers, and the need for improvement in

---

[1] The memorandum stated that the "increasing amount of inappropriate, unprofessional, and insubordinate behavior in the form of conversation regularly occurring," such as "[r]epeated derogatory comments about [other employees and management]," is "unacceptable and will not be tolerated."

her relationships with coworkers.

In August 2019, plaintiff and Gross exchanged emails about plaintiff's upcoming knee surgery, which was scheduled for October 18, 2019. Plaintiff had been receiving medical treatment for her left knee since 2014, for injuries that she sustained in a motor vehicle accident in 2012. Prior to surgery, plaintiff informed Gross that she planned on taking unpaid leave for her recovery period, pursuant to the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601. Plaintiff provided Gross the necessary paperwork from her physician, Dr. Dana Tarandy, and she was set return to work on January 23, 2020, which exhausted her leave under the FMLA. On January 14, 2020, however, Dr. Tarandy issued a note that plaintiff would be unable to return to work as planned, and Gross granted plaintiff discretionary unpaid leave until February 14, 2020. Plaintiff returned to work on February 15, 2020.[2]

After returning from FMLA leave, plaintiff continued to display behavior and performance issues. In May 2020, plaintiff violated defendant's written directive against dispatching the fire department for "trouble alarms," and was told to review the directive with her supervisor. Around the same time, plaintiff reviewed her 2019 performance appraisal with O'Connell, her other supervisor. Plaintiff scored "Below Expectations/Needs Improvement." Two weeks later, plaintiff again violated the "trouble alarm" directive. This time, plaintiff attempted to conceal her error by calling the battalion chief to ask him to direct his lieutenant, who received the dispatch, not to tell Gross about the incident. Plaintiff explained that Gross "ha[d] a target on [her] back." This call was problematic for plaintiff because she used a recorded line, and defendant discovered it.

---

[2] The record shows that Gross and plaintiff had a series of miscommunications prior to plaintiff's return to work and after her return, regarding plaintiff's ability to work overtime, but neither party dwells on these miscommunications in their briefs.

On June 15, 2020, defendant issued a memorandum containing administrative investigative findings from her second "trouble alarm" incident and associated attempt at concealment, and stated that her employment was terminated, effective immediately.[3] Overall, plaintiff received five formal disciplinary actions throughout her employment with defendant, and was terminated while on probation. Yet, plaintiff complains that defendant terminated her employment on the basis of her disability. She also complains the was terminated in retaliation for verbally informing Gross that she needed a knee replacement less than a week before her termination, on June 9, 2020.

First, plaintiff states that her performance was not lacking. According to plaintiff, she received "accolades" from the deputy chief of the Village of Norridge for her performance in March 2020, and trained other employees in 2019. Plaintiff supports her version of the facts with an unnotarized statement of the events at issue from her perspective. For example, according to plaintiff, Gross sought to mentor her with the goal of making her a supervisor, rather than part of a performance improvement plan. She emphasizes the praise that she received from Gross, including that "she was the most qualified person in the room (including supervisors) and because of that, [he] would be holding her to higher standards because of her experience, knowledge, skills, and training."

Plaintiff also provides another perspective on her interactions with Gross regarding her knee injury. According to plaintiff, she informed Gross of her knee injury in early to mid-2018, and "[s]hortly after discussion of her knee injury," her mentoring sessions with Gross "turned into a hypercritical examination of otherwise discretionary conduct." In her deposition, plaintiff

---

[33] In her deposition, O'Connell testified that there are a variety of potential reasons for delays between insubordinate conduct and discipline, such as callers waiting to complain, callers complaining the wrong place first, or Gross's thorough investigations before discipline.

testified that she was subjected to criticism for the same actions that other similarly situated employees were not criticized or disciplined for, which she attributes to her disability. Conversely, in his deposition, Gross testified that plaintiff may have received more severe consequences than other employees because she had a more extensive discipline record.

Plaintiff provides a litany of other behavior issues by other employees and their consequences, or lack thereof. For example, she provides a disciplinary memorandum for Kelly Brooks ("Brooks") from June 2018, in which Brooks entered an incorrect address and received a one-day suspension, despite a prior incident dispatching officers to the wrong location. Plaintiff provides examples of other employees causing response delays, such as Daniel DeVries ("DeVries"), Paulette Joris ("Joris"), and her supervisor Perez, who received oral reprimands. Joris received a written reprimand for another delay, in a separate incident. TC Paulsen ("Paulsen") and "Telecommunicator Flis" did not receive disciplinary action when they caused response delays. Heber Villavicencio ("Villavicencio") and Chris VanGeerty ("VanGeerty") received counseling for one delay, and written reprimands for another.

Plaintiff also provides examples of conduct by other employees that, according to her, defendant treated differently for the same behavior. She provides a disciplinary memorandum for Colleen Termine ("Termine"), who yelled and swore at a caller but received only counseling. Paulsen received a written reprimand for being argumentative, disrespectful, and insubordinate, and counseling when she skeptically questioned a caller about an incident. Moreover, Brooks did not receive disciplinary action after dispatching a "trouble alarm," and Paulsen received only an oral reprimand for erroneously activating a fire alarm. Last, plaintiff states that Villavicencio received only an oral reprimand for gossiping about Gross with other employees, whereas plaintiff received a three-day suspension for discussing the same information. Based on the

evidence presented, defendant moves for summary judgment.

## LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden to show that there is no genuine dispute of material fact preventing the entry of judgment in its favor as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The Supreme Court has determined that a fact is "material" when it may affect the outcome of the suit under the governing law and the dispute is "genuine" when the evidence is such that a reasonable jury could return a verdict for the nonmovant. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

When considering a motion for summary judgment, the court's function is limited to determining whether the parties have provided sufficient evidence to support a factual dispute that warrants submission to a jury. See id. at 249. The court must view all facts in the light most favorable to the nonmovant and draw all reasonable inferences in her favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). But the nonmovant must do more than raise "some metaphysical doubt as to the material facts." Id. at 586. Rather, the nonmovant "must present affirmative evidence in order to defeat a properly supported motion." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

## DISCUSSION

The ADA prohibits employers from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To succeed on a claim for disability discrimination

7

under § 12112(a), a plaintiff must show that: (1) she has a disability; (2) she is otherwise qualified to perform the essential functions of the job with or without reasonable accommodations; (3) she suffered an adverse employment action; and (4) the adverse action was caused by her disability. See Kurtzhals v. Cnty. of Dunn, 969 F.3d 725, 728 (7th Cir. 2020).

Courts have further distilled the standard for discrimination under the ADA. The primary question is whether plaintiff has produced sufficient evidence to support a reasonable jury finding of intentional discrimination. See Ortiz v. Werner Enters., Inc., 834 F.3d 760, 765 (7th Cir. 2016). One method of showing intentional discrimination is the burden-shifting McDonnell Douglas framework. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Under the McDonnell Douglas test, plaintiff bears the initial burden to demonstrate a prima facie case for discrimination. See Brooks v. Avancez, 39 F.4th 424, 434 (7th Cir. 2022). To demonstrate a prima facie case, plaintiff must show that: (1) she has a disability; (2) she performed her job to defendant's legitimate expectations; (3) she suffered an adverse employment action; and (4) one or more similarly situated individuals outside her protected class received more favorable treatment. Id.

If the court concludes that a reasonable jury could find that plaintiff has established a prima facie case for disability discrimination, the burden shifts to defendant to articulate a legitimate, non-discriminatory reason for terminating plaintiff. Id. Then, plaintiff may present evidence that defendant's stated reason is pretextual, or a falsehood, rather than an honestly held belief. Id. at 435. In certain limited circumstances, courts merge their inquiries into whether the defendant has provided a nondiscriminatory explanation and whether that explanation is pretextual. Id. Courts merge these inquires when the plaintiff argues that the legitimate expectations of an employer may themselves be tainted by discrimination, as here. Id.

8

In the instant case, the parties do not dispute that plaintiff's chronic knee problem is a disability, nor do they dispute that plaintiff suffered an adverse employment action when she was terminated. The parties dispute whether plaintiff was a "qualified individual" and whether plaintiff provides evidence of similarly situated individuals who received more favorable treatment.

The court begins by accepting defendant's argument that no reasonable jury could find that plaintiff established a prima facie case for discrimination because she was not a qualified individual under the ADA, and even if she was a qualified individual, defendant had a legitimate, nondiscriminatory reason to terminate her employment. A terminated employee is a "qualified individual" when that employee satisfied the employer's legitimate criteria for the job at the time of termination, or could perform the job's "essential functions" with or without reasonable accommodations. See Hammel v. Eau Galle Cheese Factory, 407 F.3d 852, 862 (7th Cir. 2005).

According to defendant, no reasonable jury could find that plaintiff was a qualified individual because employees who violate a company's rules and policies do not meet its legitimate expectations. See Budde v. Kane Cnty. Forest Pres., 597 F.3d 860, 862–63 (7th Cir. 2010). Plaintiff admits that she repeatedly violated company policies, and that defendant disciplined her numerous times. Plaintiff was even disciplined during her probationary period, when she was on notice that further violations could result in her termination. Further, plaintiff performed "below expectations" during both annual performance reviews. Accolades and licenses do not change those facts.

Plaintiff counters that a reasonable jury could still find that she established a prima facie case of discrimination because the evidence as a whole, viewed in the light most favorable to her, suggests a genuine dispute. Plaintiff argues that her performance reviews are misleading, and

she received recent positive feedback. Moreover, plaintiff argues that a reasonable jury could find that Gross disparately applied defendant's progressive discipline policy, and this disparate application was part of "the ongoing discrimination that commenced once MCD knew of Plaintiff's knee condition." Specifically, plaintiff argues that she was disciplined more severely than similarly situated, non-disabled dispatchers.

A dispatcher is "similarly situated" if the dispatcher is comparable in "all material respects," "without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." See Gates v. Caterpillar, Inc., 513 F.3d 680, 690 (7th Cir. 2008) (internal quotations omitted). The non-disabled, similarly situated employee must have a comparable set of failings. See Taylor-Novotny v. Health Alliance Medical Plans, Inc., 772 F.3d 478, 492 (7th Cir. 2014).

The first problem for plaintiff is that her assertions are largely supported only by her amended complaint and unnotarized "affidavit." Allegations from a complaint cannot stand as evidence as the summary judgment stage. See Talignani v. United States, 26 F.4th 379, 386 (7th Cir. 2022). In addition, affidavits are admissible only if sworn before an officer authorized to administer an oath, such as a notary public. See Sheikh v. Grant Regional Health Ctr., 769 F.3d 549, 551 (7th Cir. 2014). Non-affidavit declarations are admissible under 28 U.S.C. § 1746, but they must conform with certain formalities, such as being made "under penalty of perjury" or verified as "true and correct." DeBruyne v. Equitable Life Assur. Soc. of the United States, 920 F.3d 457, 471 (7th Cir. 1990). In the instant case, plaintiff made her statements "being first duly sworn on my oath," and "depose[s] and state[s]" that "if called to testify would testify to the following," which is inadequate.

Even after defendants pointed out the inadmissibility of plaintiff's "affidavit," she took

no action to submit a proper affidavit or declaration. Absent any such evidence, the record is devoid of anything that would support plaintiff's claims. Even if the court were to allow plaintiff's statement, it does not give her unsupported statements much weight, because a plaintiff's subjective beliefs about her qualifications do not defeat defendant's substantial evidence that it had a legitimate, non-discriminatory basis to terminate her. See Lauth v. Covance, Inc., 863 F.3d 708, 715–16 (7th Cir. 2017).

The second problem for plaintiff is that she has not provided affirmative evidence of a similarly situated dispatcher, or that Gross's decisions to more severely discipline plaintiff were connected to her knee condition. Even if plaintiff informed Gross of her condition in 2018, she still provides no affirmative evidence that such knowledge influenced his discipline. She provides only speculation, which is insufficient. See id. at 717. Moreover, to the extent that other dispatchers have similar disciplinary histories and performance records—which the court is not persuaded that they do[4]—plaintiff has not provided evidence of another dispatcher who attempted to conceal her mistake while on probation. This is a material failure by plaintiff. Based on plaintiff's lack of affirmative evidence to suggest otherwise, a reasonable jury could not find that plaintiff was terminated based on her disability, or that defendant's legitimate reason for her termination was pretextual.

Next, the court evaluates whether a reasonable jury could find that defendant retaliated against plaintiff after she told him that she would need a knee replacement. To succeed on such a claim, plaintiff must show that she: (1) engaged in a protected activity; (2) suffered an adverse employment action; and (3) a causal connection exists between the two. See Rozumalski v. W.F.

---

[4] DeVries, for example, had "exemplary" performance before receiving an oral reprimand for entering the wrong address, and she was "receptive to the feedback." Joris self-reported her wrong address and was "receptive to the feedback." Plaintiff, to the contrary, attempted to conceal her deficient performance.

Baird & Assocs., Ltd., 937 F.3d 919, 924 (7th Cir. 2019).

In the instant case, the parties dispute whether plaintiff engaged in a protected activity, and whether plaintiff's termination was caused by her disability. Plaintiff's retaliation argument centers on suspicious timing. In her "affidavit," plaintiff emphasizes that defendant terminated her employment "[n]ot even a week" after she informed him that she needed a knee replacement, and argues that "by requesting accommodations and leave from work due to her disability, [she] engaged in a protected activity." Defendant disagrees. According to defendant, plaintiff did not engage in a protected activity on June 9, 2020, when she may have informed Gross about her knee surgery in the future, because she did not request accommodations or leave at that time. Moreover, before that date, Gross granted both plaintiff's leave and her request for accommodations. The court agrees with defendant that there is no reasonable basis for a jury to conclude that plaintiff's retaliation claim is based on a protected activity. Moreover, the court is not persuaded to accept plaintiff's "affidavit" in the first place, which is pivotal for her retaliation claim.

Even if plaintiff did engage in a protected activity by informing Gross about her need for a knee replacement, the court agrees with defendant that plaintiff has not provided affirmative evidence to allow a reasonable jury to find that this exchange caused her termination. If the court accepts plaintiff's argument that the Seventh Circuit does not use a "but for" causation standard to evaluate retaliation claims, she does not offer an alternative causation standard, or cite a case that offers one. Instead, plaintiff emphasizes her ability to use circumstantial evidence to show causation which, based on its motion, defendant never doubted.

A bigger problem for plaintiff is that the Seventh Circuit has determined that "suspicious timing alone is not enough to establish a causal connection between the adverse action and the

12

protected activity." Abebe v. Health & Hosp. Corp. of Marion Cnty., 35 F.4th 601, 608 (7th Cir. 2022). Because plaintiff provides only unsupported assertions of suspicious timing and pretext as evidence for her retaliation claim, no reasonable jury could find in her favor. Accordingly, the court grants defendant's motion for summary judgment.

## CONCLUSION

For the reasons set forth above, the court grants defendant's motion for summary judgment (Doc. 50).

**ENTER:**

**Robert W. Gettleman**
**United States District Judge**

**DATE:  April 12, 2023**